1  AMY R. LEVINE, State Bar No. 160743
   alevine@DWKesq.com
2  WILLIAM B. TUNICK, State Bar No. 245481
   wtunick@DWKesq.com
3  KASMIRA M. BROUGH, State Bar No. 308791
   kbrough@DWKesq.com
4  Dannis Woliver Kelley
   2087 Addison Street, 2nd Floor
5  Berkeley, CA 94704
   Telephone: 510.345.6000
6  Facsimile: 510.345.6100

7  RICHARD B. KATSKEE, Appearance *Pro Hac Vice*
   katskee@au.org
8  KENNETH D. UPTON, Appearance *Pro Hac Vice*
   upton@au.org
9  Americans United for Separation of Church and State
   1310 L Street NW, Suite 200
10 Washington, DC 20005
   Telephone: 202.466.3234
11 Facsimile: 202.898.2133

12 Attorneys for Defendants
   NANCY ALBARRAN, HERB ESPIRITU, PETER GLASSER,
13 and STEPHEN MCMAHON

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16

17 | ELIZABETH SINCLAIR, CHARLOTTE        Case No. 5:20-cv-2798-LHK
   | KLARKE, FELLOWSHIP OF
18 | CHRISTIAN ATHLETES, an Oklahoma      **DEFENDANTS' OPPOSITION TO**
   | corporation, and FELLOWSHIP OF       **PLAINTIFFS' MOTION FOR**
19 | CHRISTIAN ATHLETES OF PIONEER        **PRELIMINARY INJUNCTION**
   | HIGH SCHOOL, an unincorporated
20 | association,

21           Plaintiffs,                  Hearing Date:   October 14, 2021
                                          Time:           1:30 p.m.
22           v.                           Courtroom:      Courtroom 8, 4th Floor
                                          Judge:          Lucy H. Koh
23 | NANCY ALBARRAN, in her official and
   | personal capacity, HERB ESPIRITU, in his
24 | official and personal capacity, PETER
   | GLASSER, in his official and personal
25 | capacity, and STEPHEN McMAHON, in
   | his official and personal capacity,
26
             Defendants.
27

28

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

**TABLE OF CONTENTS**

2

Page

3

TABLE OF CONTENTS ..................................................................................................... i

4

TABLE OF AUTHORITIES ............................................................................................. iii

5

I.      INTRODUCTION ................................................................................................... 1

6

II.     STATEMENT OF FACTS ...................................................................................... 1

7

III.    ARGUMENT AND AUTHORITY ......................................................................... 4

8

A.      Correct Legal Standard for Mandatory Injunctions ............................................... 4

9

B.      Plaintiffs Do Not Clearly Show They Will Succeed On The Equal Access Act Claim ........... 4

10

        1.      The law and facts do not clearly establish that Pioneer FCA meets the EAA's
                fair-opportunity criteria. ................................................................................. 4

11

12

        2.      The EAA and Constitution permit schools to enforce nondiscrimination
                policies that afford all students fair and equal access to recognized student
                groups. ............................................................................................................ 5

13

14

        3.      The Policy requires groups to afford students equal access and opportunities
                for participation; it does not dictate who the members must elect as leaders. ............. 7

15

C.      Plaintiffs Have Not Shown That They Will Clearly Succeed On Their Selective-
        Enforcement Claims ............................................................................................... 8

16

17

        1.      The Policy neither targets religious groups nor is enforced selectively based on
                any student group's viewpoint. ........................................................................ 8

18

        2.      Pioneer FCA Is Not Entitled to an Exemption from the District's Reasonable
                and Neutral Rules ............................................................................................ 9

19

20

        3.      The District Is Not Selectively Enforcing The Policy Against FCA ........................ 11

21

                a.      The District did not "gerrymander" to exclude FCA ................................... 12

22

                b.      The District did not derecognize FCA because of hostility toward its
                        religious viewpoint ...................................................................... 12

23

                c.      There are no exceptions to the Policy for student clubs .............................. 13

24

                d.      The District's standards and practices are not arbitrary............................. 15

25

                e.      District practices unrelated to student clubs under the EAA are not
                        probative of Plaintiffs' claims ............................................................ 17

26

27

28

DWK DMS 3738173v1

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

D.   Plaintiffs Have Not Clearly Shown That The District Violated Their Free Speech And Associational Rights Or The Religion Clauses. .................................................................. 21

E.   The District Policy Targets Plaintiffs' Conduct, Not Their Religious Beliefs Or Identity, And Thus Does Not Trigger Strict Scrutiny. ........................................................ 23

F.   Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors .................... 23

IV.   CONCLUSION ............................................................................................................... 24

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1   **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alpha Delta Chi-Delta Chapter v. Reed*,
   648 F.3d 790 (9th Cir. 2011)...................................................6, 7, 8, 10, 11, 15, 16, 22, 23, 24

*American Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. Re-1*,
   158 F.Supp.3d 1123 (D.Colo. 2016) ...................................................................22, 24

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013)..........................................................................................23

*Bethel Sch. Dist. No. 403 v. Fraser*,
   478 U.S. 675 (1986) .......................................................................................................19

*Boy Scouts of Am. v. Dale*,
   530 U.S (2000) ........................................................................................................21, 22

*Bus. Leaders in Christ v. Univ. of Iowa*,
   360 F. Supp. 3d 885 (S.D. Iowa 2019)..........................................................................16

*Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Department*,
   533 F.3d 780 (9th Cir. 2008).........................................................................................17

*Christian Legal Soc. v. Eck*,
   625 F. Supp. 2d 1026 (D.Mont. 2009) ....................................................................11, 14

*Christian Legal Society v. Martinez*,
   561 U.S. 661 (2010) .........................................1, 6, 7, 8, 9, 10, 11, 12, 17, 21, 22, 23, 24

*City of Cleburne, Texas v. Cleburne Living Center*,
   473 U.S. 432 (1985) .......................................................................................................17

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) .............................................................................................18, 23

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015)...........................................................................................4

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) .......................................................................................................22

*Harris v. Itzhaki*,
   183 F.3d 1043 (9th Cir 1999).........................................................................................13

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) .......................................................................................................19

iii

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Healy v. James*,
    408 U.S. 169 (1972) ............................................................................. 13

*Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996) ..................................................................... 8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1995) ...................................................................... 10, 22

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
    408 F. Supp. 3d 960 (S.D. Iowa 2019) ................................................. 16

*Johnson v. Poway Unif. Sch. Dist.*,
    658 F.3d 954 (9th Cir. 2011) ................................................................ 21

*Morse v. Frederick*,
    551 U.S. 393 (2007) ............................................................................. 19

*Moss v. Spartanburg Cty. Sch. Dist. No. 7*,
    775 F. Supp. 2d 858 (D.S.C. 2011) ..................................................... 13

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................. 12

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*,
    636 F.3d 1150 (9th Cir. 2011) .......................................................... 4, 24

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 ......................................................................................... 21

*Rosenbaum v. City & Cty. of S.F.*,
    484 F.3d 1142 (9th Cir. 2007) ............................................................. 15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................................... 5

*Stormans, Inc. v. Wiesman*,
    794 F.3d 1064 (9th Cir. 2015) ............................................................. 15

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (2002) ............................................................................. 17

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ......................................................................... 23

*Truth v. Kent Sch. Dist.*,
    634 F.3d 634 (9th Cir. 2008) ...................... 5, 7, 8, 9, 10, 14, 16, 21, 22, 23, 24

*Wayte v. United States*,
    470 U.S. 598 (1985) ............................................................................. 14

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

iv

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ................................................................................................ 5

*Winter v. NRDC*,
  555 U.S. 7 (2008) .................................................................................................... 4

**Federal Statutes**

20 U.S.C. §§ 1400 *et seq.* ............................................................................................ 20

20 U.S.C. § 1681(a) ....................................................................................................... 12

20 U.S.C. § 4071(a) ............................................................................................... 6, 9, 14

20 U.S.C. § 4071(b) ....................................................................................................... 19

20 U.S.C. § 4071(c)(5) .................................................................................................... 4

20 U.S.C. § 4071 (c)(1) ................................................................................................. 19

20 U.S.C. § 4071 (c)(2) ................................................................................................. 19

20 U.S.C. § 6394 ........................................................................................................... 20

42 U.S.C. § 2000d ......................................................................................................... 12

**State Statutes**

Cal. Educ. Code § 221.5(f) ........................................................................................... 20

Cal. Educ. Code § 35160.5(a) ...................................................................................... 19

Cal. Educ. Code § 35179 .............................................................................................. 19

Cal. Educ. Code § 35179(a) ......................................................................................... 19

Cal. Educ. Code § 54443.1 ........................................................................................... 20

Cal. Educ. Code § 54740(b) ......................................................................................... 20

Cal. Educ. Code § 54740(c)(4) ..................................................................................... 20

Cal. Gov't. Code § 11135 ............................................................................................. 12

**Federal Regulations**

34 C.F.R. § 106.34(a)(3) ............................................................................................... 20

34 C.F.R. § 106.40(b)(3) ............................................................................................... 20

34 C.F.R. § 106.41(b) ................................................................................................... 20

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1
2
3

**State Regulations**

4

Cal. Code Regs. tit. 5 § 4910(d) ................................................................. 19

5

Cal. Code Regs. tit. 5 § 4910 (j) ................................................................. 19

6

Cal. Code Regs. tit. 5 § 4920 ..................................................................... 19

7

Cal. Code Regs. tit. 5 § 4921(a) ................................................................. 20

8

Cal. Code Regs. tit.5 § 4922 ....................................................................... 19

9

Cal. Code Regs. tit. 5 § 4925 ..................................................................... 20

10

Cal. Code Regs. tit. 5, § 4926 ..................................................................... 12

11

Cal. Code Regs. tit. 5 § 4940(b) ................................................................. 20

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1          **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Schools in the San Jose Unified School District recognize a broad array of clubs in which students learn from each other by interacting in social and intellectual contexts. The "vibrant dialogue" the District fosters "is not possible if students wall themselves off from opposing points of view." *Christian Legal Society v. Martinez*, 561 U.S. 661, 705 (2010) (Kennedy, J. concurring) ("*CLS*"). Yet that is exactly what Plaintiffs seek by insisting that students, as a condition of full participation in the Pioneer FCA Chapter, be "required to avow particular personal beliefs or to disclose private, off-campus behavior" that specifically targets for disapproval of lesbian, gay, bisexual, and transgender students. *Id.* Indeed, predicting the very issue now before this Court, Justice Kennedy cautioned that:

> Students whose views are in the minority at the school would likely fare worse in that regime…. The era of loyalty oaths is behind us. A school quite properly may conclude that allowing an oath or belief-affirming requirement, or an outside conduct requirement, could be divisive for student relations and inconsistent with the basic concept that a view's validity should be tested through free and open discussion.

*Id.* at 705-06. The divisiveness about which he warned has come to roost at Pioneer High School.

At bottom, this case is about a loyalty oath required by a non-school organization that directs, controls, and prohibits equal access to an affiliated student group. The oath targets lesbian, gay, bisexual, and transgender students in a discriminatory way that discourages participation in a student group— something done by *no other* recognized student club. The District's nondiscrimination policy, which from a legal perspective functions similarly to an "all comers" policy, and is now explicitly labeled as such ("Policy"), does not disfavor those who hold religious beliefs. Rather, the Policy regulates the *conduct* of discriminating against other students based on their identity—regardless of whether the motive is secular or religious. It requires that all students be eligible to seek leadership positions in any recognized student club, leaving the members free to elect the leaders they want. The Policy thus does not control who recognized groups *elect* as leaders, nor does it prohibit non-recognized groups from discriminating in setting eligibility requirements. It requires only that a group seeking recognition not benefit from that status while also using discriminatory criteria to bar students from seeking leadership opportunities in violation of the Policy.

## II.   STATEMENT OF FACTS

The District's decision to revoke recognition was never about religious views; it was about

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

protecting against the exclusion of gay, lesbian, and transgender students from participation in groups officially recognized as ASB clubs. The District has created robust limited public forums at three high schools, authorizing students to form and seek recognition of student clubs. These forums have always included student-initiated religious organizations, like the Shekinah Christian Club at Leland and the Jewish Culture Club and Christian Club at Willow Glen. (Third Amended Complaint ("TAC"), ¶101.) The District makes no judgements about the viewpoints of any club and is in no way hostile toward religion. (Mayhew 194:19-195:12, 200:2-19; McMahon 138:3-159:6, 166:12-167:10.[1]) Indeed, while Plaintiffs Charlotte Klarke and Elizabeth Sinclair were co-presidents of Pioneer FCA during the 2018-19 and 2019-20 school years, they also headed Pioneers for Christ, an ASB-approved group with views indistinguishable from FCA. The only distinction between Pioneer FCA and Pioneers for Christ is that the latter did not require leaders to subscribe to a pledge that barred or discouraged LGBTQ students from applying. (Klarke 191:6-192:8; Sinclair 73:2-7; Mayhew ¶22; Ex. M.[2])

Plaintiffs paint a misleading picture of a school principal kowtowing to the demands of a religion-hating mob. The reality is quite different. In April 2019, two non-FCA affiliated Pioneer students, discovered FCA's Statement of Faith and Sexual Purity Statement ("Statements"), and on April 22 or 23 they approached Principal Espiritu with concerns the Statements violated the Policy. (Espiritu 186:9-187:1, 192:16-19.) Espiritu spoke with Klarke and Sinclair about the situation on April 23; and two days later he heard from FCA Bay Area Metro Director Rigo Lopez, who confirmed that students were required to affirm the Statements to become leaders. (Espiritu 187:16-24, 198:18-24; Levine Ex. U.) FCA contacted legal counsel at that time. (Lopez 136:21-137:7, 138:19-139:20.) Separately, on April 22, another student voiced concerns about the Statements to AP History Teacher Peter Glasser, who forwarded them to Espiritu.  (Glasser 173:17-174:12; Levine Ex. Z .)  The Statements required FCA's leaders to affirm that "God desires his children to lead pure lives of holiness. The Bible is clear in teaching on sexual sin including sex outside of marriage and homosexual acts. Neither heterosexual sex outside of marriage nor

---

[1] Citations to deposition transcripts are to the last name of the deponent followed by the page and line number. Excerpts of deposition transcripts are attached to the Declaration of Amy R. Levine filed in support of this opposition.
[2] Citations to declarations submitted in support of this opposition are to the last name of the declarant, followed by the paragraph or exhibit.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

any homosexual act constitute an alternative lifestyle acceptable to God." (Levine Exs. Y, AA, BB.)
Pioneer Activities Director Michelle Mayhew testified that she was "shocked" when she saw the
Statements, of which she had been unaware, because the club was not allowing all students the opportunity
to become leaders. (Mayhew 160:23-162:12, 202:21-203:9.) Plaintiffs do not deny they require student
leaders to conduct themselves according to the Statements or that the Statements are discriminatory
towards LGBTQ students. (Levine Exs. U, AA, BB.)

Espiritu called the District office for guidance, and on April 29 he forwarded the Statements to
Deputy Superintendent Stephen McMahon. (Espiritu 193:10-194:4; Levine Ex. Y.) McMahon researched
the issue, consulted with legal counsel, and responded to Espiritu, providing him with "Talking Points"
explaining that a club would not be eligible for ASB recognition if it violated the Policy. (McMahon ¶10,
Ex. I; McMahon 30:23-33:18, 34:18-35:10, 36:3-22, 38:24-39:19, 56:13-19, 58:4-9, 99:20-100:8, 132:2-
133:21.) On May 2, Espiritu met with Klarke and Sinclair, telling them that the club would not be
officially recognized but could still meet on campus as an interest group. (Klarke 170:6-171:1; Sinclair
110:4-111:19; McMahon Ex. I.) Thus, though the group would not be included in the yearbook or the list
of official student clubs or be eligible for an ASB financial account (essentially, a bank account) or a
faculty advisor, it could still use school facilities and have faculty at its meetings for supervision. (Espiritu
86:6-87:18, 88:-7-11; Klarke 140:10–141:3, 141:7-11; Sinclair 114:5-16.) The only *actual* effect on
Pioneer FCA was that it was not in the 2019-20 yearbook. The group continued to meet, hold large events
in the auditorium and have faculty support. Its membership numbers were unaffected, as was its financial
status, for the group had never requested an ASB financial account in the first place. (Klarke 48:18-49:3,
50:17-20, 51:13-16, 141:7-9, 177:6-9; Sinclair 23:22-25:2; Mayhew 43:6-25, 45:1-47:10, 50:10-51:16,
171:25-172:17.) And because it was not under the ASB, Pioneer FCA was free to use whatever leadership
criteria it desired. (McMahon, 74:22-75:15; McGee Ex. B.)

Also in May 2019, the District revoked FCA's ASB-club status at Willow Glen High School.
(Levine Ex. T.) That group, too, was permitted to meet as an interest group.  (*Id*.) The group's organizer,
had started the club in 2015, but she graduated in 2018. (Lopez 102:8-11; McGee ¶16.) The group then
disbanded at the end of 2018-19. (Lopez 105:9-107:23.) And at Leland High, Principal Peter Park met in
September 2019 with the group's faculty advisor, Gary Clarke. They talked about the requirement that all

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

3

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

students be allowed to attend and become leaders of ASB clubs, and about having Leland FCA continue to act as a student interest group—a status that already existed at Leland. (Levine Ex. S; Walsh ¶2.) But because Leland FCA had been the same set of students since its inception in 2017-18, it had already become defunct after the active leadership graduated. (Levine Ex. Q; Lopez 87:1-88:23, 97:4-101:24.) No students have applied for ASB recognition of a FCA club at Leland since 2019-20, or at Willow Glen since 2018-19. (*Id.*; Lopez 107:20-108:2; Levine Ex. Q.) At Pioneer, Plaintiffs Klarke and Sinclair graduated in June 2020. (ECF No. 49.[3]) Students L.W. and B.W. took over FCA leadership in 2020-21. During COVID-19 school closures, all clubs that applied were given provisional ASB status. (Mayhew 176:7-177:1; Mayhew, ¶¶4, 15.) L.W. and B.W. graduated in June 2021. (Mayhew ¶20.) Since then, no students have submitted applications for an FCA-affiliated club, and Plaintiffs offer no declarations of any who say that they plan to do so. (*Id.*)

## III.   ARGUMENT AND AUTHORITY

### A.   Correct Legal Standard for Mandatory Injunctions

Pioneer FCA seeks a preliminary injunction—an "extraordinary remedy never awarded as of right" (*Winter v. NRDC*, 555 U.S. 7, 24 (2008))—to compel the District to recognize it for the 2021-22 school year. In seeking a mandatory injunction, its burden is "doubly demanding": it must establish the law and facts *clearly favor* its position, not simply that it is likely to succeed. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (*en banc*) (citing *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994)). Mandatory injunctions are "particularly disfavored" and should not issue in doubtful cases. *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs have not met this heightened burden.

### B.   Plaintiffs Do Not Clearly Show They Will Succeed On The Equal Access Act Claim

#### 1.   The law and facts do not clearly establish that Pioneer FCA meets the EAA's fair-opportunity criteria.

One of the fair-opportunity criteria required under the EAA is that "non-school persons may not direct, conduct, control, or regularly attend activities of student groups." 20 U.S.C. § 4071(c)(5). Although discovery is ongoing, evidence shows that FCA—an outside organization—directs and controls the

---

[3] This Court previously determined they lack standing to seek prospective relief.

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

1   selection of student-chapter leaders in the District, through required submission for final approval of FCA-

2   drafted leadership applications (which include the discriminatory oath that is at the center of this dispute).

3       Plaintiffs Sinclair and Klarke generally agreed that students who attend Pioneer FCA meetings fall

4   into two tiers: leaders and the remaining non-leader participants or attendees. (Klarke 23:1-7; Sinclair

5   17:21-18:2.) Primary participation and responsibility rests with the "leaders," an amorphous group that is

6   not clearly defined and who do not hold formal titles (aside from those designated as president and vice

7   president to satisfy school requirements). (Klarke 49:9-11, 52:13-16; Sinclair 11:15-23; Levine Ex. K.) A

8   "leader" submits an FCA Student Leader Application—including the Statements—for approval by the

9   regional FCA office. Once the applicant has been approved by the regional FCA office, the candidate is

10  presented to the members as a new leader. (Klarke 104:5-7, 107:17-21; Sinclair 19:14-21:4.)[4]

11      This scenario falls well short of the facts needed to clearly establish that Pioneer FCA satisfies the

12  fair-opportunity criteria of the EAA. The heavy-handed outside control of student chapters' leadership

13  selection means that EAA's protections do not apply to FCA or its affiliate student chapters. This is

14  sufficient to deny Plaintiffs' request.

15          **2.      The EAA and Constitution permit schools to enforce nondiscrimination
                      policies that afford all students fair and equal access to recognized student
16                    groups.**

17      In *Widmar v. Vincent*, 454 U.S. 263, 267 (1981), the Supreme Court concluded that a public

18  university that allowed secular student groups to meet on campus created a limited public forum, so it must

19  also make space available to religious student groups. The Court recognized that universities are not

20  required to create these forums, but if they do, they must not discriminate against groups simply because

21  of the religious viewpoint of their speech. *Widmar*, at 267; *accord Truth v. Kent Sch. Dist.*, 634 F.3d 634,

22  649 (9th Cir. 2008), *overruled on other grounds*, *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29 (2010);

23  *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). The EAA

24  extended these principles to public secondary schools, making it unlawful for "any public secondary

25  school which receives Federal financial assistance and which has a limited open forum to deny equal

26

27  _____

    [4] Adding to the overwhelming evidence of FCA control rather than student control, recent interrogatory
    responses served by the Pioneer FCA chapter were answered by an employee of FCA, who declined to
28  identify *any* members of the club who are current students, assuming they exist.

access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

In considering facts that closely mirror those presented here, the Supreme Court in *Christian Legal Society v. Martinez* considered a challenge by Hastings Law students who had partnered with the national Christian Legal Society ("CLS") to organize a club. CLS required its student chapters to make officers and members sign a Statement of Faith obligating them to conduct their lives in accordance with that Statement's principles. *CLS,* at 672. "Among those tenets is the belief that sexual activity should not occur outside of marriage between a man and a woman." CLS interpreted this to require it to exclude anyone who engaged in "unrepentant homosexual conduct." *Id*. The law school, however, had an "all-comers policy" under which "Hastings requires ... that registered student organizations allow any student to participate, become a member or seek leadership positions in the organization regardless of their status or beliefs." *Id.* at 675 & fn. 5.

The Supreme Court, applying its limited-public-forum analysis, held that a public educational institution may deny an organization official recognition when doing so is reasonable in light of the purposes served by the forum, and the school's actions are viewpoint neutral. *CLS*, at 685. It concluded that Hastings' all-comers policy was "reasonable and neutral" and held the school did not violate the First or Fourteenth Amendments in denying recognition to CLS. *Id*. at 669. The Court straightforwardly declared that a public university does not violate the Constitution when it "condition[s] its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students." *Id*. at 668.

The Ninth Circuit held that the same analysis and conclusion apply when a school enforces a nondiscrimination policy that identifies for protection specific characteristics such as "race, gender, religion, and sexual orientation." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 795 (9th Cir. 2011). The plaintiffs in that case were a Christian fraternity and sorority that sought official recognition from San Diego State University but were denied because their membership requirements conflicted with the university's nondiscrimination policy. *Id*. at 796. The Court held that the University was entitled to enforce its policy as to those organizations, concluding that "antidiscrimination laws intended to ensure

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

6

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

equal access to the benefits of society serve goals 'unrelated to the suppression of expression' and are neutral as to both content and viewpoint." *Id.* at 801-02.

In doing so, the Court drew on *Truth*, 542 F.3d 634, which held that "[w]hen the state *restricts access to a limited public forum* in a way that interferes with a group's speech or expressive association … we apply the lesser standard of scrutiny," not "strict scrutiny." *Id.* at 652. Applying limited-public-forum analysis, the court held the school could refuse to recognize a Bible club that required members to be Christian and voting members to sign a Statement of Faith. Noting that the refusal was "based on the [the student group's] discriminatory membership criteria, not the religious 'content of the speech'" or its religious viewpoint, the court rejected arguments that the school violated the EAA or the Free Speech and Association Clauses. *Id.* at 639, 645-51. Here, the Court has already held that the Policy is reasonable and viewpoint-neutral, dismissing any challenge to its validity. (ECF No. 49 at 22-24.)

3.    **The Policy requires groups to afford students equal access and opportunities for participation; it does not dictate who the members must elect as leaders.**

Plaintiffs contend that they are entitled to impose discriminatory leadership criteria that they believe are crucial to the religious functioning of Pioneer FCA. The Policy does not dictate who members elect as leader of a group, however, but instead requires merely that all students be allowed to seek the opportunity. The Supreme Court and Ninth Circuit have already held that there is no right to bar particular classes of students from this opportunity when the school requires otherwise.

*Alpha Delta* held that the university could enforce its nondiscrimination policies against student groups with exclusionary criteria *for both members and officers*. *Alpha Delta*, at 795-96 (plaintiffs' applications denied because they required that "members and officers profess a specific religious belief"). And in *CLS*, the Supreme Court explicitly upheld the right of the university to enforce its all-comers nondiscrimination policy against a religious student organization that excluded members and officers who held contrary religious views or had engaged in "unrepentant homosexual conduct." *CLS*, at 670-71. Indeed, the very first paragraph of the decision set forth the issue before the Court: "May a public law school condition its official recognition of a student group and the attendant use of school funds and facilities on the organization's agreement to open eligibility for *membership and leadership* to all students?" *Id.* at 668 (emphasis added). The Court interpreted plaintiffs' argument as encompassing the

Dannis Woliver Kelley
2087 Addison Street, 2nd Floor
Berkeley, CA 94704

7

leadership issue, boiling it down to: "*Who* speaks on [a club's] behalf,… colors *what* concept is conveyed." *Id.* at 680 (emphasis in original). The Court then rejected a multitude of arguments about how open leadership would subvert the group's message or hijack the organization, concluding that the student group could use other neutral criteria to ensure those who joined or sought to lead the group would support its cause. *Id.* at 692-93. Thus, the law is clear that religious student groups have no right to recognition from a public educational institution if they discriminate in eligibility for either membership or leadership.

Plaintiffs' invocation of *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996), avails them not. Though the *Hsu* court granted an exemption from a nondiscrimination requirement for a student group's president, vice-president, and music coordinator because of their particular religious duties (*Id.* at 858)—while also rejecting claims for exemptions for the secretary and activities coordinator, which the group argued must also be prepared to lead prayers and Bible study—the case was decided before *CLS* (and *Alpha Delta*), which held that schools *can* permissibly refuse recognition to clubs with exclusionary criteria for leadership opportunities. And *Hsu* failed to apply the limited-public-forum analysis that *CLS* requires, instead relying on free-speech and expressive-association arguments and demands for preferential treatment of religion that *CLS* flatly rejected. *CLS*, at 669, 687-90.[5]

### C.   Plaintiffs Have Not Shown That They Will Clearly Succeed On Their Selective-Enforcement Claims

#### 1.   The Policy neither targets religious groups nor is enforced selectively based on any student group's viewpoint.

The Policy is reasonable and neutral. *Truth*, at 645-46 ("whether a statute is content neutral or content based is something that can be determined on the face of it"). And this Court so held in dismissing Plaintiffs' facial challenge to the Policy. Undeterred, Plaintiffs contend that it amounts to unreasonable content-based discrimination. (MPA 20-22). They have not met their heavy burden to so demonstrate.

---

[5] What is more, *Hsu* refused exemptions for some officer positions because they would have created too large a loophole for discriminatory exclusion (*Id.* at 857), FCA's lack of a formal officer structure means that all the students may be classed as leaders subject to the exclusionary requirements. (Levine Ex. K.) And *Hsu* acknowledged that valid grounds might exist to reject a club whose "discriminatory policies would disadvantage, subordinate, or stigmatize the excluded students" (*id.* at 871), which is precisely the case here for LGBTQ students: Plaintiffs seek categorically to bar from leadership opportunities everyone who cannot pledge to live in accordance with a statement that targets and demeans LGBTQ students. That requirement is not just coercive but dangerously effective at undermining rules intended "to promote tolerance, understanding, and respect, and safeguard students from invidious forms of discrimination, including sexual orientation discrimination." *CLS*, at 701 (Stevens, J. concurring).

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

Proving content-based discrimination requires showing that the District barred Plaintiffs' speech *because* it was religious. Yet Plaintiffs admit that religious speech is permitted in the forum, as is controversial speech. (MPA 21:14-16; Espiritu 85:6-86:1, 96:25-97:25, 112:15-20, 116:8-21.) Pioneer FCA itself participated in the forum for several years without incident, until Principal Espiritu learned that it enforced discriminatory criteria in determining who could be a leader. (Mayhew 159:11-17, 194:19-195:12; Lopez 45:20-25; TAC ¶56.) Meanwhile, Pioneers For Christ continued as an ASB-recognized club and even co-sponsored events with Pioneer FCA. (Klarke 189:11-196:3; Mayhew ¶22, Ex.M.) There is no content-based discrimination here. *See Truth*, at 648 n.2 (fact that other schools in district granted recognition to Bible groups that did not discriminate in membership made it "less likely that the District's application of its anti-discrimination policy … was merely a pretext for religious animus").

Nor is there viewpoint discrimination. The broad spectrum of student interests represented in the forum shows its viewpoint neutrality. *CLS*, at 705. And application of an all-comers policy to allow all students to participate does not discriminate based on viewpoint but instead enforces a neutral set of rules for all speakers. "It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* at 694 (emphasis in original).

As the Supreme Court made clear, it is not unconstitutional for a public educational institution to refuse to subsidize conduct that it disapproves through a religiously neutral, generally applicable all-comers policy. *CLS,* at 689-90. That the club might then forgo official recognition in order to maintain discriminatory leadership requirements is not an impermissible burden on religion but a choice the group can make. (SJUSD 37:16-38:12; Sinclair 114:5-16.) And if it does, it remains free to meet on campus, associate with anyone it chooses, and exclude from leadership (or membership) whomever it wishes.

### 2. Pioneer FCA Is Not Entitled to an Exemption from the District's Reasonable and Neutral Rules

The special religious carve-out from the District's generally applicable nondiscrimination policies that Plaintiffs seek runs afoul of the EAA; which guarantees religious student organizations *equal* access, not *special* access. 20 U.S.C. § 4071(a). Plaintiffs fail to explain how this Court can require the District to award them preferential treatment, when Congress has provided otherwise. *Truth,* at 646-47 (EAA prohibits only content-based restrictions on religious groups; it does not preclude burdening their speech or

9

activities and does not grant them special treatment). Further, the EAA requires equal access not only for religious groups, but also for political and philosophical groups, and indeed, all groups regardless of the content of their speech. Religious speech is not more exalted under the statute than political speech. Plaintiffs' proposed carve-out from the nondiscrimination policy because it is a religious group would require identical carve-outs for *all* student groups—and the exception would swallow the rule.

Neither is the District obliged to grant an exemption to Pioneer FCA under the Free Exercise Clause. *CLS* has already rejected attempts to draw from far-flung free-speech, expressive-association, and free-exercise cases, making clear that limited-public-forum analysis supplies the appropriate doctrinal framework to consider Plaintiffs' speech, associational and free-exercise claims. *CLS*, at 680-81 ("it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association," so the strict scrutiny test applied in other contexts is inappropriate in this context), see also, *Id.* at 697, n.27 (free-exercise rights are also considered under that framework).

Denying official recognition as a student organization because of non-adherence to a nondiscrimination policy does not compel the group to accept any members or leaders. It merely conditions the benefit of recognition on compliance with reasonable, secular rules intended to open leadership opportunities to all students. *CLS*, at 682-83. As the Supreme Court emphasized: in seeking exemption from an across-the-board all-comers policy, CLS sought not equal treatment, but preferential treatment. *Id.* at 697, fn. 27. *Alpha Delta* relied on these same principles:

> Were San Diego State compelling Plaintiffs to include non-Christians, Plaintiffs might have a sound argument. But as [*CLS*] makes clear, there is a difference 'between policies that require action and those that withhold benefits.' 130 S.Ct. at 2986. The Supreme Court declined to apply the line of expressive association cases – including *Dale* and [*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995)] – in the context of a student organization program because the university was not forcing student groups to accept unwanted members, but only conditioning certain benefits on the adoption of a nondiscrimination policy.…

*Alpha Delta*, at 802-03; see also, *Truth*, at 652. FCA is free to discriminate by limiting its members or leaders. But, it cannot then complain that not being officially recognized violates its rights.

Hoping to evade *CLS*, Plaintiffs argue that because student clubs may use some criteria, such as attendance, in selecting student leaders, Pioneer FCA should be permitted to exclude students who are, or are perceived to be, gay and transgender. But permitting other groups to use non-discriminatory criteria

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

10

1   does not deny fair opportunity and equal access in a way that violates the Policy. *CLS* did not require clubs

2   to abandon all membership or leadership requirements, and recognized a variety of ways a group could

3   preserve its purpose and viewpoint while doing do. *CLS,* at 692-93 (permissible to use nondiscriminatory,

4   selective criteria, such as "attendance, the payment of dues, or other neutral requirements designed to

5   ensure that students join because of their commitment to a group's vitality, not its demise").

6        Plaintiffs also contend that their discriminatory leadership requirements are crucial to leading

7   prayer or worship (MPA 19), but they fail to explain why this would be so—much less why it is more true

8   or legally pertinent here than in *CLS* and *Alpha Delta*. Former student leaders Sinclair and Klarke

9   explained the purpose and activities of the club during their tenure, never putting prayer at the fore; and

10  they dispelled the idea that only group "leaders" could direct prayer. (Klarke 58:21-29:14, 208:19-210:24;

11  Sinclair 35:10-20.) They also testified that FCA's views on marriage and homosexuality were never

12  brought up at meetings. (Klarke 193:13-22; Sinclair 48:24-52:4.) The evidence does not support that

13  holding those views is otherwise crucial, or that the club has treated them as such: Both Sinclair and

14  Klarke were leaders of the Pioneer FCA before they signed FCA's Student Leader Application containing

15  the Statements. (Levine ¶¶7-9.) And they testified that they did not recall seeing the Sexual Purity

16  Statement before this dispute arose. (Klarke 125:12-127:21; Sinclair 69:21-71:3; Espiritu 198:18-24.)

17  Leader Applications at Willow Glen High School show that "leadership" was open to anyone willing to

18  sign the Statements, even those simply exploring their religious views.  (Levine Exs. J, K.)  Moreover,

19  even if certain beliefs or traits are crucial to the group's success, the Policy does not prevent members

20  from considering the beliefs of candidates during the election of leaders. Given all of that, and the fact that

21  the Statements figure so little in the club's actual activities, it is difficult to regard FCA's requirement as

22  anything other than pretext for discrimination against LGBTQ students.

### 3.   The District Is Not Selectively Enforcing The Policy Against FCA

24        Plaintiffs argue that if they are not entitled to a categorical exemption for religious reasons, then

25  the Policy still should not apply to them because the District selectively enforces it. But Plaintiffs fail to

26  show that the District has enforced the Policy selectively against them, much less that it continues to do so,

27  which is what matters for purposes of the preliminary-injunction motion. *Christian Legal Soc. v. Eck,* 625

28  F. Supp. 2d 1026, 1045 (D.Mont. 2009) (where plaintiffs alleged "improper motive" in prior decision to

Dannis Woliver Kelley
2087 Addison Street, 2nd Floor
Berkeley, CA 94704

11

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    eliminate funding from student group, "[a]bsent some evidence of ongoing viewpoint discrimination, such

2    as the granting of exemptions to other non-complying student groups," there were no grounds for

3    prospective relief); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct

4    does not in itself show a present case or controversy regarding injunctive relief …").

5                    *a.    The District did not "gerrymander" to exclude FCA*

6           First, Plaintiffs contend that the District intentionally "gerrymandered" its Policy to single out FCA

7    for adverse treatment because of hostility toward its religious views. But there is no evidence of that—

8    much less the clear evidence required here. The District did not come up with its Policy simply to oppress

9    FCA. Rather, it has had a nondiscrimination policy for years, as is legally required. (Levine Ex. CC; see,

10   e.g., Cal. Gov't. Code § 11135; 20 U.S.C. § 1681(a), 42 U.S.C. § 2000d.) As in *CLS*, the District interprets

11   its Policy to require clubs to allow all students to participate. This interpretation is not new. (McMahon

12   99:17-100:8, 206:13-207:11, 208:6-209:6, 209:16-210:4; SJUSD 145:17-146:8, 168:22-169:11; Espiritu

13   63:1-7, 78:16-19.) Neither is it unique to the District: California law provides: "Membership in student

14   clubs must be open to all students regardless of sex, sexual orientation, gender, ethnic group identification,

15   race, ancestry, national origin, religion, color, or mental or physical disability." Cal. Code Regs. tit. 5,

16   § 4926. This is, however, the first time the District received a complaint of exclusionary practices.

17   (Espiritu 63:8-10; McMahon 28:15-22.) And the District was legally bound to respond—which it did by

18   establishing the "student interest group" category at Pioneer. That was not to punish FCA, but to allow it

19   to function as closely as possible to a recognized club, while still ensuring compliance with the law and

20   District policy.[6] (McMahon, ¶10, Ex. I; McMahon 30:23-33:18, 34:18-35:10, 36:3-22, 38:24-39:19,

21   56:13-19, 58:4-9, 99:20-100:8, 132:2-133:21; SJUSD 37:11-38:12, 96:21-97:3.)

22                    *b.    The District did not derecognize FCA because of hostility toward its*
23                    *religious viewpoint*

24           Second, there is no credible proof that the District was hostile toward FCA's viewpoint. Unlike

25   ───────────────────

26   [6] After derecognition, the group was still entitled to hold meetings on campus, use the auditorium for
     events, participate in club rush, and advertise by posting fliers on campus and distributing them via
     Instagram accounts. It had no loss of members, and no fewer meetings or events. It still had two faculty
27   members to supervise its activities. (Klarke 139:19-141:3; Sinclair 118:21-121:20.) Espiritu testified that
     FCA would have still been able to fundraise, and to participate in the Food Fair and Diversity Week.
28   (Espiritu 87:10-18, 89:12-15, 92:14-17, 93:9-14, 110:14-132:11.)

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Healy v. James*, 408 U.S. 169 (1972), for instance, this is not a case where school officials had a knee-jerk reaction to having a religious or controversial organization on campus. On the contrary, FCA chapters existed at three District schools for years until the administration learned that FCA maintains discriminatory leadership practices. FCA's violation of the Policy, not the group's viewpoint, required action. Indeed, the Complaint alleges that this was the District's stated reason for acting, and Plaintiffs admitted in depositions that they were unaware of any other reason for the derecognition decision. (See e.g., TAC ¶¶72, 137; Klarke 170:6-171:23; Lopez 143:5-23; Mayhew 34:8-16, 166:1-6; Espiritu 46:9-47:3, 110:4-13, 195:17-19, 197:16-198:2 (confirming that violation of Policy was reason for revocation).)

Plaintiffs' reference to statements made by teachers, students or others, often taken out-of-context after the fact, is irrelevant. *Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir 1999) ("remark unrelated to the decisional process … is insufficient to show discrimination"); *Moss v. Spartanburg Cty. Sch. Dist. No. 7*, 775 F. Supp. 2d 858, 872 (D.S.C. 2011) (school district not liable for board members' stray remarks). Deputy Superintendent McMahon, with assistance of legal counsel, advised Espiritu that a student club that maintains exclusionary requirements for club leaders violated the Policy. (McMahon , ¶10, Ex. I; McMahon 30:23-33:18, 34:18-35:10, 36:3-22, 38:24-39:19, 56:13-19, 58:4-9, 99:20-100:8, 132:2-133:21; Espiritu 33:21-34:11, 40:16-24, 45:15-25; Levine Ex. Y; Klarke 174:7-18.) Prior to the communications from Espiritu, McMahon had no knowledge of FCA at all. (McMahon 89:22-90:21.) True, a student complaint of discrimination *triggered* the District's actions, however, the instruction to Espiritu came from the superintendent level, which did not communicate with, or base their decision on information from any teachers, students, Pioneer's Climate Committee, or opinions in the student press. (McMahon 71:13-72:10, 90:22-91:1, 94:3-95:4, 106:15-107:10, 161:1-14; McMahon ¶¶11-12; Mayhew 32:7-14, 34:20-23, 64:22-65:5, 65:20-66:1, 164:12-165:1, 167:4-7, 172:13-19, 173:1-14; Espiritu 72:3-16, 221:8-19; Glasser 244:23-245:6.)

c.      There are no exceptions to the Policy for student clubs

After rummaging through hundreds of applications and constitutions of other student groups, Plaintiffs have failed to show that the District selectively enforces its Policy against FCA. Though the District may have inadvertently approved applications of a handful of organizations over the years with questionable policies, Plaintiffs have not shown (1) that the decisionmakers regarding FCA here knew

13

DWK DMS 3738173v1

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

1   about or were involved in any of those determinations; (2) that others groups did in fact violate the Policy;

2   or (3) that there is any basis to find that Plaintiffs were deliberately singled out for adverse treatment

3   because of their religious views. Absent a showing that the District's actions were "deliberately based

4   upon an unjustifiable standard such as … religion," the Court should defer to the District's decisions.

5   *Wayte v. United States*, 470 U.S. 598, 607-08 (1985).

6          Plaintiffs insist, however, that they are like other clubs that organize around an idea. But, those

7   groups are not similarly situated to FCA under the Policy because they do not exclude anyone. That their

8   members may share an interest—such as the advancement of women in the sciences or promoting rights

9   for African-Americans—does not mean that they exclude students based on sex or race. *Truth*, at 648;

10  *Christian Legal Soc.*, at 1045. The EAA requires the District to allow groups with political, ideological,

11  and religious views to form and to meet on campuses on the same terms as other groups (20 U.S.C.

12  § 4071(a)), and the District welcomes and encourages that. There is no discrimination.

13         Though Plaintiffs point to two student-club applications (out of hundreds approved just at Pioneer

14  over the years) as supposedly being approved despite problematic paperwork, that does not show anything

15  like selective enforcement or targeting of FCA because of its religious beliefs. Espiritu was asked at his

16  deposition to look at a constitution and bylaws for the Big Sister / Little Sister Club, which he had never

17  seen before. (Espiritu 152:21-153:12.) In that moment, he said that the documents did not raise a red flag

18  to investigate further; but also testified that if a sophomore boy wanted to join "this club would have to be

19  inclusive and consider it." (Espiritu 133:2-135:9.) The District's 30(b)(6) testimony regarding the club was

20  consistent. (SJUSD 141:6-21.) And there is no evidence that the club actually excluded students. (Mayhew

21  ¶30, Ex.Q.) Plaintiffs also point to approval of Girls Who Code and the "Simone Club." (MPA 4:25-5:1,

22  17:12-13.) Plaintiffs provide no evidence of how or why they believe that these groups received "waivers"

23  of the Policy, or that these groups ever excluded boys, or that site-level or District administrators were

24  aware of such circumstances before being shown exhibits in a deposition and asked to speculate about

25  what they mean or how to address them. (E.g., Espiritu 152:21-153:12, 172:12-22.)  Plaintiffs also submit

26  no proof that the Simone Club was ever ASB approved and the District has no record of that – or even that

27  the group applied. (Mayhew ¶¶26, 27, Ex. C,D,E,F, H,G.)  Plaintiffs also ignore evidence that boys

28  actually do participate in – and lead – Girls Who Code. (Glasser 182:8-183:2; Mayhew ¶¶25-28.)

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

14

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

The practical realities of the club recognition process matter.[7] There is no ongoing monitoring of club practices. (Mayhew 12:21-13:9; Espiritu 63:11-13, 77:6-78:8.) Unless a matter is brought directly to the attention of a principal, the principal is not involved, and District-level staff have never been involved in club-approval issues, except with respect to the FCA because the matter raised legal issues. (Espiritu 27:7-9, 28:11-18; 63:11-13, 64:14-17, 118:10-20; McMahon 27:18-28:14; SJUSD 99:18-100:7, 212:6-16, 214:1-15.) To assume, as FCA apparently does, that the District has affirmatively investigated all clubs and singled-out FCA for derecognition out of animus is simply wrong. Mayhew never conducted in-depth investigations into any student clubs when they applied for recognition. Thus, the fact remains that site-level decisionmakers have been unaware of any group analogous to FCA, with its requirement that its leaders subscribe to a discriminatory statement and its refusal to agree to the District's Policy. Thus, there is no group similarly situated to FCA on which Plaintiffs can rest their selective-enforcement claims. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015) ("Because no complaints have been filed against Catholic-affiliated pharmacies or against other pharmacies for non-religious refusals, [they] are not similarly situated…. Therefore, they provide no evidence of selective enforcement."); *Rosenbaum v. City & Cty. of S.F.*, 484 F.3d 1142, 1152–53 (9th Cir. 2007) (for equal protection claim, plaintiff must show that others were similarly situated but not prosecuted).

> d.   The District's standards and practices are not arbitrary

Nor does the assertion that Mayhew may have missed a few clubs' problematic paperwork establish viewpoint discrimination. Administrative error is not actionable, as the court clarified in remanding *Alpha Delta*:

Plaintiffs' characterization of the evidence may not be correct. For example, it is

---

[7] Students formed groups at the beginning of each year, and could apply for ASB approval by submitting a one-page application form. Students on the ASB board (elected by the student body) receive applications each year, and Michelle Mayhew, a classroom English teacher who also serves as the Pioneer Activities Director, does a high-level review to see that the applications comply with school requirements. (Mayhew 12:11-16, 12:25-13:9, 20:24-22:3, 27:22-28:14; Mayhew ¶¶5-10; Espiritu 76:24-77:5.) ASB makes an initial decision regarding approval and the applications are then given to Espiritu who has the power to override the decision. (Mayhew 191:19-192:14; Espiritu 20:12-21, 22:2-7, 63:25-64:5, 75:16-24; Mayhew ¶¶6-8.) Approved clubs that want an ASB financial account (akin to a bank account) are later required to submit a budget, and new clubs must submit a constitution. Clubs that existed previously do not resubmit their constitutions and they are not reviewed by the Activities Director. (Mayhew ¶10;Lopez Ex. C; Klarke 156:16-159:12; Espiritu 152:21-153:13 (clarifying that he had not seen constitutions before his deposition).)

15

1    possible that these groups were approved inadvertently because of administrative
2    oversight, or that these groups have, despite the language in their applications, agreed
     to abide by the nondiscrimination policy.

3    *Id.* at 804.[8] The threshold question is thus whether the District *actually, intentionally* exempted certain

4    student groups from the nondiscrimination policy while denying an exemption to FCA. Plaintiffs have no

5    proof that anything like that occurred.

6         Plaintiffs also contend that acting to enforce a policy in response to complaints is selective

7    enforcement. Not so. The evidence does not support that the only time that site staff get involved is based

8    on a complaint. Instead, they get involved when there is any red flag that a student group may violate any

9    district policy. For instance, in 2016-17 the Make America Great Again group (which was actually a group

10   interested in fishing) was initially approved but then misbehaved at club rush, was spoken to by the

11   Pioneer staff, and then disbanded. (Mayhew 26:9-27:2, 28:15-29:4; Mayhew ¶23; Espiritu 82:14-83:20.)

12   Similarly, when the Satanic Temple club applied for ASB recognition in 2019-20, the group was called to

13   Espiritu's attention because the name was controversial. Only after Espiritu met with the club's organizer,

14   who explained and provided documents about the club's purpose, and then conferred with District staff did

15   he approve it. (Mayhew 103:24-104:5, 106:20-107:14; Espiritu 29:8-19, 73:12-21, 84:13-20, 119:5-121:6;

16   122:21-123:8, 124:13-21; Levine Exs. V, W.) Espiritu also testified that he would investigate if there was

17   a complaint or he became personally aware of a student being excluded from a club. (Espiritu 145:21-

18   146:3.)  Even if process were complaint-driven, which it is not, that does not make it impermissible. If it

19   did, nearly all regulation, and nearly all criminal law, would be invalid, because in both contexts

20   enforcement in response to complaints is the norm. And none of the cases to which Plaintiffs point even

---

[8] In both *InterVarsity Christian Fellowship/USA v. Univ. of Iowa,* 408 F. Supp. 3d 960 (S.D. Iowa 2019) and *Bus. Leaders in Christ v. Univ. of Iowa,* 360 F. Supp. 3d 885 (S.D. Iowa 2019), aff'd in part, rev'd in part and remanded, 991 F.3d 969 (8th Cir. 2021), the district court opinions paid lip service to Ninth Circuit's ruling in *Alpha Delta* – controlling here – as an example of persuasive authority from other circuits, but then completely misconstrued the decision. In *InterVarsity*, the district court acknowledged the remand for further proceedings on the issue of developing the justifications for ostensible different treatment under the school's nondiscrimination policy, but treated the case as if the matter was decided. In *Alpha Delta* (as in *Truth* before it) the Court's instructions on remand are essential to understanding what the Court there did (starting from the place of "we were not convinced the school acted improperly"). Even more dismissive was the district court's short shrift of *Alpha Delta* in *Business Leaders in Christ*— barely a passing mention. Thus, whatever misguided view the court had of the Ninth Circuit's controlling authority should not matter here.

Dannis Woliver Kelley
2087 Addison Street, 2nd Floor
Berkeley, CA 94704

16

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

hint to the contrary.[9]

Plaintiffs acknowledge the District has begun to institute new protocols for review of student clubs, including having all clubs sign an Affirmation Statement that they will abide by District policies on nondiscrimination and hazing. The District is also in the process of revising its club applications, developing form constitutions, and training its Activities Directors. Thus, for the 2021-22 school year and into the future, the District will have a more reliable mechanism to identify and respond to groups that exclude students from membership or leadership on discriminatory bases. (McGee ¶¶8-14, Ex. B,C; SJUSD 213:4-10; Mayhew 126:7-11, 127:3-7; Espiritu 149:9-16, 150:25-151:16; Levine Ex. X ; Mayhew ¶¶15-17.) Evidence that groups, including those identified by Plaintiffs, maintain discriminatory policies and refuse to change them will be grounds for denying ASB recognition. (McGee ¶¶13-14.[10])

Finally, the District's allowance of nondiscriminatory criteria for holding club leadership roles is not too vague. For decades, employers, educational institutions, public agencies, and the courts have all been called on to distinguish discriminatory from nondiscriminatory criteria. Plaintiffs cite no authority to show why school officials cannot do so here. (E.g., Espiritu 173:14-177:1, 188:9-189:3.) Further, allowing clubs to use nondiscriminatory criteria does not vitiate the all-comers policies; the examples provided by the District in its Affirmation Statement track those endorsed by *CLS*. *CLS,* at 693.

        e.    *District practices unrelated to student clubs under the EAA are not*
              *probative of Plaintiffs' claims*

Plaintiffs contend that the Policy is selectively enforced because the District allows eligibility criteria in sports and extracurricular activities. But, the District has never said that an all-comers policy

[9] *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Department*, 533 F.3d 780, 787-88 (9th Cir. 2008), recognizes that if a "statute, as read by the police officers on the scene, would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of…content-restrictive regulations"—not that a municipal noise ordinance is unconstitutional because the police enforce it only when a neighbor calls in a complaint. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (2002), involved a town's enforcement solely against an orthodox Jewish group of a law banning posting on public utility poles while routinely allowing multitudes of other postings that were far more open and obvious. And *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 448 (1985), held that unconstitutional discrimination in zoning against persons with mental disabilities was not rendered lawful just because a town council "was concerned with the negative attitude of the majority of property owners," not that zoning decisions in general cannot take the neighbors' wishes into account.
[10] Plaintiffs assert that District witnesses "stated that FCA will not be granted ASB recognition this year because of [their] beliefs and their perceived offensiveness to students" (MPA 19:17-19), but the testimony they cite says nothing of the sort, only that if FCA were to reapply for official status with the same leadership requirements, it would likely be denied again. (The same or similar misrepresentations are repeated at MPA 20:18-20 and 15:8-10.)

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

1   applies to those activities. (McGee, Ex. B.)  Alternatively, Plaintiffs contend that because there are

2   "exceptions" to the nondiscrimination policy outside the context of ASB-recognized clubs, the Policy is

3   not generally applicable and therefore subject to strict scrutiny. But the fact that the Policy does not apply

4   to all District programs and activities, or to all in precisely the same way, does not mean it is applied

5   arbitrarily or that it discriminates against FCA. Context matters.

6          Whether enforcement is religiously neutral depends on whether *similar* activities are treated

7   similarly, not whether *different* activities and *different* programs in *different* contexts are nonetheless

8   treated as though they are all identical. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1880 (2021)

9   (nondiscrimination law's application to public accommodations does not compare to application of same

10  policy in foster-care system). Indeed, if everything a school district did was subject to this comparison, all

11  districts would be deemed to "selectively enforce" rules since all of them treat different students

12  differently, as required by law.

13         Plaintiffs' positions suffer from a lack of understanding that there are different governmental

14  interests—all compelling, whether or not they need to be under the pertinent legal standards (which they

15  do not for the nondiscrimination requirements for student clubs, where all that is needed is a legitimate

16  interest)—that are being advanced in the different contexts. That points to the need for, and

17  appropriateness of, different policies in those different contexts. And pulling from other contexts to point

18  to supposed unequal applications of a supposed overarching policy is a category mistake. For example, in

19  academic programs there are strict statutory and constitutional requirements to ensure that all students

20  have full and fair access to educational opportunities. Both legally and in practice, it is sometimes

21  necessary to structure special, targeted programs or supplemental services to ensure that access. And in

22  athletics, the legal requirements are similarly about achieving the aim of full and fair opportunities for all,

23  but the context of sports, and especially interscholastic sports, turns out to call for achieving this end by

24  different means—namely, equal participation opportunities regardless of sex under Title IX and California

25  law. Simply put, there are governmental interests, many admittedly related, but different contexts call for

26  achieving those ends by different means. Through this lens, Plaintiffs' assertions of unequal treatment fail.

27         Pioneer FCA describes itself as a club, which according to California regulation is "a group of

28  students which meets on school property and which is student initiated, student operated and *not*

18

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*sponsored* by the educational institution." An "extracurricular activity" is a different class of activity – namely, one "that *is sponsored* by [a school district] or an organization sanctioned by the [district]" but is neither a "program that is part of the regular curriculum" nor "interscholastic, intramural, or club athletics." Cal. Educ. Code § 35160.5(a); Cal. Code Regs. tit. 5 §§ 4910(d), (j), 4920 (emphasis added). That makes interscholastic, intramural, and club athletics a third distinct category, with interscholastic athletics coming by statute under the "general control" of the District's governing board, which is "responsible for all aspects of the interscholastic athletic policies, programs, and activities in its district, including, but not limited to, eligibility …." Cal. Educ. Code § 35179(a). And just as the various aspects of student life are governed by different legal requirements, with the students having different rights and responsibilities under the different programs, so too are they subject to different Board policies. (McMahon ¶¶3-9, Exs. A-B; Espiritu 150:25-152:7.) Thus, while the District has no power to tell the Ultimate Frisbee club members how or when to practice, who to compete with, and what to wear, the District does have the right—and the responsibility—to dictate those things to the Pioneer Lacrosse Team. Cal. Educ. Code § 35179; Cal. Code Regs. tit.5 § 4922. School-sponsored activities represent the school, after all, so athletes must wear uniforms bearing the school's insignia and must comply with all District, league, section, and California Interscholastic Federation rules. (McMahon ¶¶ 6-7, Exs. C-E.)

Simply put, the EAA applies to student-initiated groups, not sponsored by the school, i.e. clubs. It does not apply to extracurricular activities or athletics. The school creates no limited open forum to allow students to "meet" by sponsoring a choir, a cheerleading squad, or a basketball team. 20 U.S.C. § 4071(a), (b), (c)(1)-(2); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). These activities are also treated differently under the First Amendment, because, for example, the public schools have "greater control" over student speech occurring in a context that "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," such as extracurricular or cocurricular activities or athletics. *Hazelwood*, at 271. And in settings such as classrooms or school assemblies, the school need not tolerate speech inconsistent with its "basic educational mission." *Id.* at 266-67; *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Morse v. Frederick*, 551 U.S. 393 (2007).

Thus, whether the District allows choral groups to consider singing ability or football teams to consider athletic ability is completely irrelevant to whether Pioneer FCA can consider a student's sexual

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

orientation in determining whether she is eligible to be club president.[11] And the fact that the District happens to use the same financial system of ASB accounts to hold funds for school sponsored activities like the athletic teams or the student government as it does for official student clubs does not erase the distinction between them under the EAA, the First Amendment, and District policies. (McMahon ¶4; McMahon 78:17-80:1, 82:19-83:8; Espiritu 94:17-22, 150:25-152:7.)

Similarly, that the District provides academic-support programs targeting specific types of students and makes other reasonable pedagogical distinctions has no bearing here. The District appropriately attempts to reach all its students and educate them regardless of race, sex, cultural background, language ability, disability, or socioeconomic status. It also appropriately differentiates between students based on age and academic ability. (McMahon 70:13-71:8, 102:8-18; Espiritu 163:5-9.) That is what it means to be a public school district. There is nothing nefarious about the District seeking to understand how students with different backgrounds learn differently, or providing additional academic support to certain demographic groups when needed to ensure equal educational opportunity.[12] (McGee ¶¶15-17; SJUSD 127:12-128:18, 129:16-130:13.) And again, when the District is itself providing academic programs or opportunities to students, that is government speech, not a limited public forum, so content and viewpoint

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

---

[11] The District's use of eligibility criteria for extracurricular activities like choir and cheerleading is lawful "where the prerequisites have been demonstrated to be essential to the success in the particular extracurricular activities." Cal. Code Regs. tit. 5 § 4925. Its use of athletic skill as a criterion for participation on a sports team is lawful, including for a single-sex team "where selection for teams is based on competitive skills." Cal. Code Regs. tit. 5 § 4921(a); 34 C.F.R. § 106.41(b). And contrary to Plaintiffs' assertions, girls *are* permitted to try out for boys' teams when there is no equivalent girls' team (34 C.F.R. § 106.41(b), Cal. Code Regs. tit. 5 § 4921), and transgender students can try out for the team of the gender with which they identify (Cal. Educ. Code § 221.5(f)). (McMahon Ex. B.)

[12] For example, students with disabilities receive specialized academic instruction and related services to allow them to access the general education curriculum under the IDEA, 20 U.S.C. §§ 1400 *et seq.*, English-language learners receive specialized instruction and supports to overcome language barriers under the Equal Educational Opportunities Act, 20 U.S.C. § 1703(f). And the District provides programming to assist migrant students, pregnant students, and parents, all as permitted (or required) by law. 34 C.F.R. § 106.40(b)(3); 20 U.S.C. § 6394; Cal. Educ. Code § 54740(b), (c)(4), § 54443.1. It also permits students to be separated by sex for sex education, also as authorized by law. 34 C.F.R. § 106.34(a)(3); Cal. Code Regs. tit. 5 § 4940(b). As for the "Latino Male Mentor Group" (MPA 10:7-11) - that appears to be a school-sponsored program designed to help ninth-grade Latino boys acclimate to high school and set themselves up for success. It is not a student club. Nor, as far as we can tell, is the "Male Summit Conference" (MPA 10:11-13), for which Plaintiffs also point to a document but lay no foundation. We do not know whether it is sponsored by a school or a third party, or indeed whether the District has any role in it at all. There is certainly nothing to suggest that it is a student-initiated club under the EAA at a District school. Similarly, the Girls' Circle is not a student club, but a counseling group started by Pioneer staff, along with the Boys' Circle. (Mayhew ¶33.) It likewise is not part of the limited-public forum or protected by the EAA.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

restrictions are not improper. *See, e.g.*, *Johnson v. Poway Unif. Sch. Dist.*, 658 F.3d 954, 961 (9th Cir.

2011) ("the Supreme Court has held that where the government acts as both sovereign and employer, this

general forum-based analysis does not apply" and teachers' classroom speech is not protected). Different

treatment of programs and activities that are subject to entirely different legal requirements is not selective

enforcement but adherence to the law.

> **D.     Plaintiffs Have Not Clearly Shown That The District Violated Their Free Speech And Associational Rights Or The Religion Clauses.**

As explained, the District has created a *limited open forum* for student-initiated clubs, not a general

public forum, so, limited-forum analysis controls. And as a binding majority of the Ninth Circuit panel in

*Truth* explained in a concurrence, a student group's exclusion from ASB-recognition because of its

discriminatory policy does not infringe any First Amendment rights or require strict scrutiny, even it

interferes with its speech or expressive association. 542 F.3d at 651-2 (citing *Rosenberger,* at 829).

Plaintiffs' invocation of the ministerial exception to complain that the District, by enforcing its

nondiscrimination policy, interferes with FCA's ability to pick its leaders, fails for similar reasons.

As noted above, the Supreme Court in *CLS* rejected the club's invocations of broader free-speech,

expressive-association, and free-exercise doctrine, concluding that limited-public-forum analysis supplies

the appropriate framework to resolve all First Amendment claims. 561 U.S. at 680-81 (noting that the

expressive-association and free-speech arguments merged, and that strict scrutiny available in other

contexts could not apply because "it would be anomalous for a restriction on speech to survive

constitutional review under our limited-public-forum test only to be invalidated as an impermissible

infringement of expressive association"); *id.* at 697 n.27 (noting that free-exercise rights are also

considered under this framework). The Court reasoned:

> [T]his case fits comfortably within the limited-public-forum category, for CLS, in
> seeking what is effectively a state subsidy, faces only indirect pressure to modify its
> membership policies; CLS may exclude any person for any reason if it forgoes the
> benefits of official recognition. The expressive-association precedents on which CLS
> relies, in contrast, involved regulations that *compelled* a group to include unwanted
> members, with no choice to opt out. See, *e.g.*, [*Boy Scouts of Am. v. Dale*, 530 U.S.
> 640, 648 (2000)] (regulation "forc[ed] [the Boy Scouts] to accept members it [did]
> not desire" …; [*Roberts v. U.S. Jaycees*, 468 U.S. 609, 623] ("There can be no clearer
> example of an intrusion into the internal structure or affairs of an association than"
> forced inclusion of unwelcome participants.)."

D<small>ANNIS</small> W<small>OLIVER</small> K<small>ELLEY</small>
2087 A<small>DDISON</small> S<small>TREET</small>, 2<small>ND</small> F<small>LOOR</small>
B<small>ERKELEY</small>, CA 94704

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*CLS,* at 682. The Court further held that denying a religious group the opportunity to be an official student organization because it refuses to adhere to a nondiscrimination policy does not compel it to accept any members or leaders or impose any burden on it. Instead, the requirement merely conditions a benefit—participation in the forum—on compliance with reasonable, secular rules. *Id.* at 682-83. As the Court explained, in seeking an exemption from an across-the-board all-comers policy, CLS sought not equal treatment, but preferential treatment. *Id.* at 697 n.27.

The Ninth Circuit relied on these same principles in *Alpha Delta* to hold that San Diego State's nondiscrimination policy could be applied to deny recognition to a religious student organization that maintained exclusionary membership and officer criteria. Citing *CLS,* the court noted the clear difference between policies that require action and those that withhold benefits, pointing out that the Supreme Court had declined to apply the line of expressive-association cases (including *Dale* and *Hurley*) to the context of a student-organization program because the university was not forcing student groups to accept unwanted members but instead was merely conditioning certain benefits on the adoption of a nondiscrimination policy. Here, as there, groups remain free to express any message they wish and to include or exclude members on whatever basis they like; they simply cannot compel a public educational institution to subsidize their choices. *Alpha Delta,* at 802-03; *Truth,* at 652.

Moreover, *CLS* recognized that democratic selection of leaders would enable a group to pursue its mission, even if less dedicated students sought to join. The Court pointed out:

> Students tend to self-sort and presumably will not endeavor *en masse* to join—let alone seek leadership positions in—groups pursuing missions wholly at odds with their personal beliefs. And if a rogue student intent on sabotaging an organization's objectives nevertheless attempted a takeover, the members of that group would not likely elect her as an officer.

561 U.S. at 692-93. FCA is no more burdened by a democratic selection process than is any other group. The District exerts no control over whom students self-select as leaders, as long as all remain eligible to apply. (Espiritu 158:12-161:9; SJUSD 225:20-227:25; McMahon 120:13-122:5, 122:17-123:17.)[13]

---

[13] Plaintiffs also fail to show any current District student group qualifies as a "ministry" or that the ministerial exception applies in this context.  FCA national has no independent right to spread its message in the public schools. *Grayned v. City of Rockford*, 408 U.S. 104, 117-18 (1972); *American Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. Re-1*, 158 F.Supp.3d 1123, 1135 (D.Colo. 2016).

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

### E. The District Policy Targets Plaintiffs' Conduct, Not Their Religious Beliefs Or Identity, And Thus Does Not Trigger Strict Scrutiny.

As shown above, the Policy targets conduct, not religious identity or belief: It bars the act of denying students a fair opportunity to participate fully in club activities, without reference to the reasons that motivate that conduct. *CLS*, at 696. Pioneer FCA's "conduct—not its Christian perspective—is, from [the District's] vantage point, what stands between the group and [ASB-recognized] status." *Id.* As in *CLS*, FCA confuses its *own* viewpoint-based objections to the District's policy with viewpoint *discrimination* by the District. So the analysis that Plaintiffs attempt to invoke from *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), does not trigger strict scrutiny.

Neither does the Supreme Court's recent decision in *Fulton*. There, the Court reaffirmed the long-standing *Employment Division v. Smith* standard, which provides that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, at 1876–77 (2021) (citing *Smith*, at 878–82.) In a narrow, fact-based decision, the Court applied heightened scrutiny because the challenged policy on its face permitted Philadelphia to grant exemptions on a discretionary, case-by-case basis, yet it categorically refused to grant religious exemptions. *Id.* at 1877-78. As *Smith* and its progeny provide, that "system of individual exemptions" undermined the law's general applicability. *See Id.* at 1877 (quoting *Smith*, at 884). But here, the District's policy contains no such system of exemptions, and this Court has recognized that the policy is reasonable and facially neutral.

Finally, this Court has permitted Plaintiffs' as-applied challenge to proceed based on assertions that the District selectively enforced its policy. But at this stage of the lawsuit the parties are in the same posture as those in *Alpha Delta* and *Truth* on remand: The record is devoid of evidence respecting the *actual reason* the District granted nondiscrimination waivers to any other clubs—if it even did that. *Cf. Alpha Delta*, at 803-04; *Truth*, at 648 n.2. For purpose of this motion, therefore, Plaintiffs cannot establish facts that *clearly show* that the District granted exemptions that would trigger heightened scrutiny.

### F. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors

Plaintiffs must establish that the facts and law clearly favor a mandatory injunction. Because this is a threshold inquiry, and one that Plaintiffs have not satisfied, the Court need not consider the remaining factors and should simply deny relief. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

1    F.3d 937, 944 (9th Cir. 2013). But Plaintiffs' request for a mandatory injunction also fails as Plaintiffs,

2    specifically the individual Plaintiffs, do not establish any irreparable harm.

3           As explained above, Pioneer FCA suffers no actual harm from the requirement of fair and equal

4    access for all students in exchange for the benefit of official recognition – much less the "extreme or very

5    serious damage" required for a mandatory preliminary injunction.  *Park Vill.,* at 1160. It can continue to

6    require the discriminatory Statements for its leaders and continue to meet on school grounds

7    unencumbered without ASB recognition.  Or it can agree to abide by the Policy, obtain recognition, and

8    rely on the democratic process to select leaders who reflect its views as all other groups do.  Either way, it

9    suffers no detriment to its rights. *See, e.g.*, *CLS*, at 680-82; *Alpha Delta*, at 803. Further, the balance of

10   equities and the public interest, as well as the animating purpose of the EAA itself, favor

11   nondiscriminatory access and participation for all students. Exempting Pioneer FCA from the Policy

12   would unfairly shift the burden and stigma of discrimination to other students.

13          Finally, even if a proper plaintiff could prevail on the merits, Plaintiffs are not those parties.

14   Plaintiffs Sinclair and Klarke's claims for prospective relief were dismissed as moot, and the "Student

15   Representatives" on whose behalf  FCA and Pioneer FCA proceed have either graduated, or have failed to

16   submit any declaration showing that their group is intact, that they have applied or will apply for

17   recognition this year, that they use or intend to use the Statements in selecting leaders, or even how they

18   would be harmed by the District's alleged future denial of recognition to the group. "The EAA's plain

19   language and legislative history demonstrate that Congress provided a remedy to a distinct class of

20   plaintiffs" "students and student groups who were denied access to a school's limited open forum," and are

21   "enrolled in federally-funded public secondary schools." *American Humanist Ass'n, Inc.*, 158 F.Supp.3d at

22   1135, citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[14]

23   **IV.    CONCLUSION**

24          The facts here are all too familiar, closely mirroring those in *CLS* and the controlling Ninth Circuit

25   authority of *Alpha Delta* and *Truth*. As in those cases, Plaintiffs seek to sidestep the District's neutral

26

27   [14] As Defendants raised in their motion to dismiss, Plaintiffs lack standing to pursue claims for injunctive
     relief. (ECF 61.) Defendants anticipate bringing a motion to revisit these standing concerns after further
28   discovery.

1    Policy so they can discourage LGBTQ students from fully participating in FCA student chapters. No other

2    school-recognized student group—religious or secular—engages in anything like that discriminatory oath-

3    demanding conduct. FCA and its student chapters stand alone. Neither the EAA nor the Constitution

4    entitles FCA to an exemption from application of the District's reasonable and neutral rules.

5    DATED: September 3, 2021                    DANNIS WOLIVER KELLEY
                                                  AMY R. LEVINE
6                                                 WILLIAM B. TUNICK
                                                  KASMIRA M. BROUGH
7

8                                                 By:  _/s/ Amy R. Levine_____
                                                  AMY R. LEVINE
9
                                                  and RICHARD B. KATSKEE
10                                                KENNETH D. UPTON
                                                  AMERICANS UNITED FOR SEPARATION OF
11                                                CHURCH AND STATE

12                                                Attorneys for Defendants
                                                  NANCY ALBARRAN, HERB ESPIRITU, PETER
13                                                GLASSER, and STEPHEN MCMAHON

DANNIS WOLIVER KELLEY
2087 ADDISON STREET, 2ND FLOOR
BERKELEY, CA 94704

DWK DMS 3738173v1    **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**